IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

DANIELLE MARIE BRADLEY,       )
                 Plaintiff,    )
                                )
v.                              )          CIVIL ACTION NO. 2:14-23774
                                )
CAROLYN W. COLVIN,              )
Acting Commissioner of Social Security, )
                 Defendant.     )

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.

By Standing Order entered July 31, 2014 (Document No. 3.), this case was referred to the undersigned

United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed

Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings

(Document Nos. 11 and 14.) and Plaintiff's Reply. (Document No. 15.)

The Plaintiff, Diana L. Wolfe (hereinafter referred to as "Claimant"), filed applications for DIB

and SSI on May 17, 2011 (protective filing date), alleging disability as of April 15, 2010, due to

multiple sclerosis, transverse myelitis, asthma, bone window in spine, PTSD, panic attacks, and

anxiety.[1] (Tr. at 14, 147-49, 150-52, 153-58, 207, 211.)  The claims were denied initially and upon

reconsideration. (Tr. at 58-61, 69-71, 75-77, 80-82, 86-88, 92-94, 95-97.) On October 31, 2011,

Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 98-99.) A hearing was

held on November 14, 2012, before the Honorable Sabrina M. Tilley. (Tr. at 25-56.) By decision dated

---

[1] On her form Disability Report - Appeal, dated October 31, 2011, Claimant alleged increased depression and anxiety as additional disabling impairments. (Tr. at 247.)

January 7, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-24.) The ALJ's decision became the final decision of the Commissioner on May 20, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on July 16, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining

physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme.

3

When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, April 15, 2010. (Tr. at 16, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "multiple sclerosis, transverse myelitis; asthma; bond window in spine, HNP thoracic spine on MRI; posttraumatic stress disorder (PTSD); panic attacks; anxiety; polysubstance abuse; personality disorder cognitive problems associated with multiple sclerosis; and memory loss," which were severe impairments. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch and crawl, but must avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors, dusts, gases, poor ventilation, and avoid even moderate exposure to hazards. She is capable of understanding, remembering and carrying out simple unskilled work, and can sustain concentration for same. The work environment must require only occasional interaction with supervisors and coworkers, and no interaction with the general public. She could make simple work-related decisions in an environment that is without fact paced production requirements and few if any change in the routine.

(Tr. at 18-19, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past

relevant work. (Tr. at 23, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a customer service, office helper, and a cashier, at the unskilled, light level of exertion. (Tr. at 23-34, Finding No. 10.) On this basis, benefits were denied. (Tr. at 24, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on August 20, 1981, and was 31 years old at the time of the administrative hearing, November 14, 2012. (Tr. at 23, 150, 153.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 23, 210, 212.) In the past, she worked as an office manager, a cashier, a sales clerk, a waitress, and a manager in the food industry.

6

(Tr. at 23, 213, 221-27.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and discusses it herein in relation to Claimant's arguments.

University Health Associates - Department of Neurology:

On February 12, 2010, prior to Claimant's alleged onset date, she presented to Dr. John Brick, M.D., and Dr. Sirinan Tazen, M.D., for a consultative examination. (Tr. at 320-23.) Drs. Brick and Tazen noted that Claimant was diagnosed with multiple sclerosis ("MS") in 2004. (Tr. at 320.) Claimant reported that nine to ten months prior, she had stopped taking medication for MS that was prescribed in 2005, due to increased leg cramps. (Id.) Claimant complained of frequent episodes of numbness of her hands, feet, and lip; swelling of her back; intermittent diplopia; vision problems; urinary retention; recent memory problems; back pain without radiation; drawing of her hands, feet, and legs with changes in skin color; and cramping. (Tr. at 320-21.) On examination, Claimant had decreased perception of the color of the right eye, in which the red looked dull; a mild action tremor; mild finger and foot tapping; and somewhat patchy distribution of decreased pinprick in the left forearm. (Tr. at 321.) It was believed that Claimant displayed some symptoms of MS, but some symptoms such as hand cramping may not have been explained by MS. (Tr. at 322.) Thus, diagnostic imaging was ordered and she was started on Betasseron. (Id.) The MRI scan of Claimant's head revealed multiple white matter lesions in the brain and cervical cord. (Tr. at 318, 326-27.) The MRI scans of her back revealed a small disc herniation T12-L1, which was thought to have caused her back pain but no significant spinal cored compression. (Tr. at 317-18, 324-25, 328-29.) Dr. Jacinto Manon, M.D., and Dr. Julian Bailes, Jr., M.D., recommended conservative treatment with non-steroidal anti-inflammatory medication and physical therapy for Claimant's back pain. (Tr. at 317.)

Camden-Clark Memorial Hospital:

On April 12, 2010, Claimant presented to the emergency department of Camden-Clark Memorial Hospital, for complaints of low back pain and tenderness after falling while walking. (Tr. at 405.) On examination, Claimant exhibited pain in the left, mid back with painful range of motion. (Tr. at 406.) Straight leg raising caused pain in both legs. (Id.) Otherwise, strength, muscle tone, sensation, and deep tendon reflexes were normal and Claimant walked with a steady gait. (Id.) Dr. J. Derek Hollingsworth, D.O., administered pain medication and a muscle relaxer, and was discharged home in stable condition. (Tr. at 405, 407.)

Claimant returned to the hospital on July 26, 2010, where she was admitted for major depressive affective disorder, recurrent episode, severe, without psychotic behavior. (Tr. at 413.) She further reported suicidal ideation and stated that she wanted to slice her wrists. (Tr. at 414, 441.) Claimant reported that she used marijuana daily, cocaine once or twice a month, and snorted opiates for pain. (Tr. at 418.) She was assessed on admission with a GAF of 35. (Tr. at 420.) While in the hospital, she was administered Lexapro to treat her depression and anxiety, which Claimant stated was very helpful. (Tr. at 441.) Claimant was discharged on August 3, 2010, with a stable affect and a denial of suicidal ideation. (Tr. at 413, 440-41.) Dr. David R. Farris, D.O., opined that her prognosis was fair with continued outpatient treatment and an avoidance of substance abuse. (Tr. at 441.)

Claimant next presented to the hospital on October 27, 2010, with complaint of shortness of breath. (Tr. at 444-45.) She was treated with an Albuterol nebulizer, prednisone and Ativan and was released "feeling considerably better," with lungs completely clear. (Tr. at 445.)

On February 24, 2011, Claimant presented to the emergency department with complaints of neck and back pain following a motor vehicle accident. (Tr. at 461-62.) Claimant had increased muscular tone, spasm, and tenderness of the spine, but otherwise had an unremarkable examination. (Id.) She was diagnosed with cervical, lumbar, and thoracic sprain, and was discharged in improved

8

condition with Vicodin and Flexeril. (Tr. at 462.)

Claimant presented to the emergency department on October 22, 2011, with complaints of a headache accompanied by dizziness and blurred vision. (Tr. at 544-45.) Dr. Remigio O. Jacob, M.D., administered pain and nausea medication and gave her a prescription for Imitrex as needed for recurring migraines. (Tr. at 545.)

On October 31, 2011, Claimant sought treatment after having been abused by her fiancé. (Tr. at 542-43.) She was diagnosed with a right L1 and L2 transverse process fracture that did not require surgical intervention. (Tr. at 543.) She was mobilized and remained in a brace and was discharged on November 3, 2011, after an unremarkable hospital course. (Tr. at 541.)

Westbrook Health Services:

Claimant sought mental treatment at Westbrook Health Services on four occasions from September 8, 2010, through October 10, 2010. (Tr. at 472-80.) On September 8, 2010, complained of sleep difficulties and reported that she had discontinued taking Remeron due to some jittery feelings. (Tr. at 479.) She presented with normal psychomotor activity and good eye contact, judgment, insight, and reality testing. (Id.) Dr. Amelia McPeak, D.O., psychiatrist, concluded that Claimant was stable and continued her current medications and added Trazadone to help her sleep. (Id.) On September 22, 2010, Claimant reported that she was doing well but was in the crisis unit due to increased anxiety and mood instability. (Tr. at 477.) Dr. McPeak assessed that Claimant was stable. (Id.) On October 7, 2010, Claimant reported continued feelings of anxiety and Dr. McPeak increased her Vistaril. (Tr. at 475-76.) On October 27, 2010, Claimant presented with a pleasant mood and denied any depression or anxiety. (Tr. at 473.) She denied suicidal or homicidal ideation and reported that her sleep and appetite had been good. (Id.) Mental status exam was within normal limits and Dr. McPeak assessed Claimant as stable. (Id.)

Atiya Lateef, M.D.:

On July 11, 2011, Dr. Lateef, a state agency reviewing physician, completed a form Physical RFC Assessment on which she opined that Claimant was capable of performing light exertional level work with occasional postural limitations, except that she never could climb ladders, ropes, or scaffolds; and an avoidance of concentrated exposure to temperature extremes, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 481-88.) On August 17, 2011, Dr. Lateef opined that his opinion remained unchanged. (Tr. at 494.) Dr. Narendra Parikshak, M.D., another state agency consultant, affirmed Dr. Lateef's opinion on September 9, 2011. (Tr. at 509.)

Cynthia Spaulding, M.A.:

On July 21, 2011, Ms. Spaulding, a licensed psychologist, performed a consultative psychological examination. (Tr. at 489-93.) Ms. Spaulding noted that Claimant was driven to the evaluation by her fiancé and that her gait, posture, and motor behavior were within normal limits. (Tr. at 489.) Claimant reported anxiety in the form of panic attacks and flashbacks that occurred in response to triggers associated with abuse from her former husband. (Id.) She also reported nightmares, delayed onset of sleep, an avoidance of crowds of people, irritability, hyper vigilant behavior, and sadness. (Id.)

On mental status examination, Claimant was alert and oriented, had a broad and appropriate affect but anxious mood, maintained good eye contact, had normal memory and psychomotor behavior, was cooperative, had mildly deficient attention and concentration but normal social functioning and judgment. (Tr. at 492.) Claimant reported that she attended family get-togethers, shopped as needed and with someone, went to drive-in movies, and took her children to the city park to play. (Id.) She described her activities as having included caring for her children, preparing food, cleaning, and interacting with her fiancé. (Id.) Ms. Spaulding diagnosed PTSD, personality disorder NOS, and polysubstance dependence in full remission. (Id.) She opined that Claimant's prognosis was fair. (Tr. at 493.)

James Bartee, Ph.D.:

Dr. Bartee, a state agency reviewing psychologist, completed a form Psychiatric Review Technique on August 23, 2011, on which he opined that Claimant's anxiety, personality disorder, and polysubstance abuse in full remission were non-severe impairments that resulted in mild limitations of maintaining activities of daily living, social functioning, concentration, persistence, or pace and no episodes of decompensation of extended duration. (Tr. at 495-508.) Dr. Bartee opined that the range and severity of Claimant's alleged psychological symptoms were disproportionate and inconsistent with the objective evidence. (Tr. at 507.) On September 9, 2011, Dr. Jeff Boggess, Ph.D., reviewed all the relevant evidence and affirmed Dr. Bartee's assessment as written. (Tr. at 510.)

Quick Care:

Claimant presented to Quick Care on September 1, 2011, with complaints of left hip pain, with radiation down the left leg. (Tr. at 315.) She exhibited left hip tenderness, but maintained a steady gait and did not have any atrophy of the major muscle groups. (Tr. at 316.) Charlotte Lantz, FWP, a nurse practitioner, prescribed Mobic and Baclofen for her pain and other symptoms. (Tr. at 316-17.) On October 22, 2011, Claimant returned to Quick Care with complaints of dizziness, vertigo, frontal headaches with pressure, blurred and double vision, nausea, and general body aches. (Tr. at 511.) Dr. William advised Claimant to seek treatment at the emergency department. (Tr. at 512.)

Med Express:

On October 16, 2011, Claimant presented to Med Express with complaints of lower extremity pain. (Tr. at 525.) Dr. Michael Beane, M.D., diagnosed osteoarthritis and administered a Dexamethasone injection. (Tr. at 526.) Claimant returned to Med Express on March 15, 2012, and complained again of lower extremity pain. (Tr. at 524.) Dr. Beane noted hip pain on palpation, prescribed a Medrol dose pack for Claimant's symptoms, and instructed her to follow up with her family physician. (Id.)

11

Riverview Primary Care - Brandon M. Wolfe, D.O.:

Claimant presented on October 26, 2011, with complaints of back and hip pain. (Tr. at 553.) Examination was unremarkable and Claimant was encouraged to return with further problems. (Tr. at 554.) In March 2012, Claimant presented for follow-up of her asthma. (Tr. at 557.) Examination again was unremarkable and she was assessed with asthma, hematochezia, and MS. (Tr. at 558.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in misstating the VE's testimony in support of her finding that Claimant can perform other work in significant numbers. (Document No. 11 at 8-10.) In particular, Claimant asserts that the ALJ failed to include the limitations of requiring only occasional interaction with coworkers and supervisors and no interaction with the general public in any of the hypothetical questions she posed to the VE. (Id. at 9.) Claimant asserts that because "the ALJ was unable to determine whether the jobs named by the VE in response to different hypotheticals were, in fact, jobs [Claimant] could perform, the ALJ's decision denying benefits at step five is not supported by substantial evidence." (Id. at 10.)

In response, the Commissioner asserts that the substantial evidence of record supports the ALJ's finding that Claimant was capable of performing a significant number of jobs. (Document No. 14 at 10-12.) The Commissioner first contends that the ALJ's failure to include the social limitations assessed in her RFC in the hypothetical questions presented to the VE likely was an unintentional error. (Id. at 10.) The Commissioner asserts that the ALJ's error was a harmless "scrivener's error" as supported by Claimant's parti-time, or 30-hours a week, work from 2010, until at least the time of the administrative hearing. (Id.) The Commissioner suggests that Claimant's work as a cashier, which required interaction with customers, was inconsistent with a limitation of no interaction with the

12

general public. (Id. at 11.) Thus, the Commissioner contends that Claimant's activities were inconsistent with the social limitations set forth in the ALJ's decision. (Id.) Nevertheless, the Commissioner asserts that even if the ALJ intentionally included the social limitations as part of Claimant's RFC, the limitations do not conflict with all of the jobs identified by the VE and any resulting error would be rendered harmless. (Id.) In particular, the Commissioner notes that DOT Occupational Code 239.567-010, identified by the VE as an office helper, does not require interaction with the general public or more than occasional interaction with supervisors and coworkers. (Id.) The Commissioner further asserts that even though the office helper job was the only job identified by the VE that was not inconsistent with the ALJ's stated RFC, the job alone existed in significant numbers in the economy. (Id. at 12.) Thus, the Commissioner contends that any error the ALJ may have committed, is harmless. (Id.)

Claimant asserts in reply that the Commissioner's argument that the ALJ committed a scrivener's error, which "was harmless error is preposterous." (Document No. 15 at 1.) She asserts that the ALJ's error has far-reaching implications that the Court cannot ignore. (Id.) Claimant alleges that the Court may not simply remove language from the ALJ's decision as the Court's review is limited to a review of the ALJ's decision as it is written. (Id.) Although the Commissioner attempts to argue that the ALJ's social limitations were inconsistent with Claimant's part-time work, Claimant asserts that such limitations were consistent with the ALJ's limitation of moderate difficulties in maintaining social functioning. (Id. at 2.) Thus, Claimant contends that the ALJ's social limitations were consistent with the remainder of her opinion. (Id.) Nevertheless, Claimant asserts that if the ALJ's error was a scrivener's error, remand is required because "[p]roof of one error only raises questions about the integrity of the ALJ's entire decision." (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence

13

because the ALJ erred in assessing her credibility. (Document No. 11 at 10-13.) Claimant asserts that

the ALJ failed to explain how her allegations were inconsistent with the evidence during the relevant

time period, failed to weigh properly the factors set forth in the Regulations, relied on treatment

records dated prior to her alleged onset date of April 15, 2010, and improperly focused on her past

relevant work as an exotic dancer. (Id. at 10.) Claimant asserts that the ALJ misstated the evidence

when she indicated that Claimant worked as an exotic dancer well after her alleged onset date and that

such work suggested a significantly greater physical ability than Claimant alleged. (Id. at 10-11.) The

ALJ improperly concluded that such work failed to bolster Claimant's credibility. (Id. at 11.) Claimant

asserts that the evidence demonstrated that she worked as a cashier after her alleged onset date and

worked as a dancer from June 2008, through April 2010. (Id.) Claimant further alleges that the ALJ

failed to comply with SSR 96-7p in her explanation finding that Claimant was not credible and failed

to consider properly the duration, frequency, and intensity of her symptoms; precipitating and

aggravating factors; medications and side effects; and her ability to afford treatment. (Id. at 12-13.)

Thus, Claimant contends that the ALJ's credibility assessment is deficient and constitutes reversible

error. (Id. at 13.)

        In response, the Commissioner asserts that contrary to Claimant's allegation, the ALJ properly

analyzed her subjective complaints. (Document No. 14 at 13-17.) The Commissioner asserts that the

ALJ specifically found that the objective evidence of record failed to support the extreme level of

symptoms and limitations alleged by Claimant. (Id. at 14.) The Commissioner notes that April 2010,

and September 1, 2011, physical examinations revealed essentially benign findings. (Id.) Respecting

Claimant's mental impairments, the Commissioner notes that Dr. McPeak concluded that her

depression was stable in 2010. (Id.) The Commissioner further asserts that the ALJ properly found that

Claimant's activities undermined her subjective complaints. (Id.) Notably, Claimant testified that she

14

continued to work as a cashier from 2010 through the date of the ALJ's decision. (Id.) Although Claimant testified that she required breaks where she would sit down and rest, the Commissioner asserts that the VE indicated that the office helper job allowed a sit/stand option. (Id.) Her further daily activities undermined her credibility. (Id. at 14-15.) The Commissioner also asserts that although Claimant takes issue with the ALJ's focus on her prior work as an exotic dancer, and although the ALJ's statements concerning such work were not factually accurate, the evidence nonetheless was persuasive. (Id. at 15.) The Commissioner asserts that such evidence was persuasive to the extent that she continued to work nearly full time throughout the relevant period. (Id.) Finally, the Commissioner asserts that the ALJ properly considered the factors set forth in the Regulations in assessing Claimant's credibility. (Id.) Accordingly, the Commissioner contends that the ALJ's credibility assessment is supported by the substantial evidence of record. (Id. at 15-16.)

Analysis.

1. Vocational Expert Testimony.

Claimant first alleges that the ALJ erred in failing to incorporate certain social limitations assessed in the RFC into the hypothetical questions posed to the VE. (Document No. 11 at 8-10.) To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of a claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally,

the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

The parties agree that the ALJ erred when she failed to include limitations respecting Claimant's restriction to occasional interaction with supervisors and coworkers and no interaction with the general public in her hypothetical questions to the VE. The Commissioner argues however, such error is harmless because the job of office helper, as identified by the VE, in the absence of such social limitations, requires no interaction with the general public and interaction with supervisors and coworkers on an occasional basis. The VE identified the office helper job as Dictionary of Occupational Titles ("DOT") as Occupational Code 239.567-010. See 1991 WL 672232. As the Commissioner notes, the general job description fails to reference working with the public and requires no more than occasional speaking, which the Commissioner equates to occasional interaction with supervisors and coworkers. The undersigned finds the Commissioner's argument persuasive and finds that the office helper job accommodates the social limitations eliminated from the VE hypothetical question. The VE testified that there were in excess of 2,400 office helper jobs regionally and over 360,000 such jobs nationally. (Tr. at 51.) Although only a single job, such numbers constitute significant numbers in the economy. See Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979)(stating that 110 jobs in the regional economy did not constitute an insignificant number of jobs). Accordingly, the undersigned finds that although the ALJ erred in failing to include the social limitations contained in her RFC assessment, such error is harmless, and therefore, the ALJ's RFC assessment in this respect is supported by substantial evidence of record.

2. Credibility Assessment.

Claimant also alleges that the ALJ erred in assessing her credibility in that the ALJ failed to provide a reasonable explanation as to why she was not credible. (Document No. 11 at 10-13.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First,

16

objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2012); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.  Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2012).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

17

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2012).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe"

18

impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 19.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 19.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 19-23.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 19.)

In discrediting Claimant's credibility, the ALJ first found that the objective evidence failed to support the extreme level of Claimant's alleged symptoms and limitations and that Claimant's allegations demonstrated an attempt "to present herself as more limited than she is in order to secure

19

benefits." (Tr. at 19.) In analyzing the objective evidence, the ALJ, considered the objective prior to

and after Claimant's alleged onset date of disability, April 15, 2010. (Tr. at 19-23.) Regarding the

relevant period, the ALJ discussed the essentially normal physical findings as contained in treatment

notes from Med Express, Quick Care, and Camden-Clarke Memorial Hospital. (Tr. at 19.) She further

acknowledged Claimant's treatment at Westbrook Health Services for her mental impairments. (Tr.

at 21-22.) This objective evidence likewise demonstrated normal findings on mental status

examinations, with the exception of some increased anxiety symptoms and one hospitalization due to

suicidal ideation, in the backdrop of polysubstance abuse. (Id.) On October 27, 2010, Dr. McPeak

assessed that Claimant's mental conditions were stable. (Tr .at 22, 473.) The ALJ noted that Claimant's

mental health treatment was not longitudinal in nature and acknowledged her polysubstance abuse

history. (Tr. at 22.) Claimant testified that she was not undergoing any mental health treatment or

taking any prescription medications. (Tr. at 22, 48.) Claimant testified that she attempted to control

her surroundings and that if she felt uncomfortable, she walked away from the surroundings. (Tr. at

48.)

　　　　The ALJ next considered Claimant's reported activities and work history. (Tr. at 21.) The ALJ

noted that Claimant cared for her young children, cared for her personal needs, was able to shop in

stores and pay bills, and could count change and handle a savings and checking account. (Id.)

Additionally, Claimant indicated in a Function Report that she was able to load the dish washer and

do laundry. (Tr. at 330.) Regarding her work history, the ALJ erroneously noted that Claimant

continued to work as an exotic dancer years after her alleged onset date and that such activity required

"significantly greater physical activity than the [C]laimant alleged." (Tr. at 21.) The ALJ found that

this work activity, which appeared to have been "somewhat physically demanding fails to bolster her

credibility." (Id.) The parties agree that the ALJ erred in making such statement. Claimant worked as

an exotic dancer from 2008 through 2010. Rather, Claimant continued to work as a cashier after her

alleged onset date and through the date of the ALJ's decision. However, Claimant testified that she was

able to maintain such employment with approximately 30 hours per week, only with approximately five to six sitting breaks in a three to four hour shift on the cash register. (Tr. at 36-38.) The Commissioner urges the Court to find that the ALJ's misstatement of Claimant's work history essentially is harmless because Claimant's actual work as a cashier was only ten hours shy of having been classified as full-time work. The Commissioner further asserts that the office helper job identified by the VE would permit Claimant a sit/stand option. Although the ALJ misstated Claimant's work history and possibly did not consider a sit/stand option, the undersigned finds that such error is harmless as the office helper job accommodates Claimant's need to alternate sitting and standing while working. Moreover, Claimant's work history was but one factor considered in assessing Claimant's credibility.

Finally, the ALJ considered the opinion evidence of record and accorded great weight to Ms. Spaulding's opinions and little weight to the state agency consultants' opinions that found Claimant did not have any severe mental impairment. (Tr. at 22.) The ALJ also gave great weight to Dr. Lateef who opined that Claimant could perform light exertional level work. (Id.) The ALJ concluded that Dr. Lateef's limitations were supported by Claimant's ongoing diagnosis of MS and were consistent with the objective evidence of record. (Id.)

Accordingly, in view of the foregoing, the undersigned finds that the ALJ complied with the Rules and Regulations in assessing Claimant's credibility and that her credibility assessment is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**,

and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 31, 2015.

R. Clarke VanDervort
United States Magistrate Judge